Next up is Jacoby & Meyers v. The Presiding Justices. Wait a minute for the courtroom to clear. We want to be able to concentrate on your argument and not be distracted because you're entitled to a full hearing. I appreciate that, Your Honor. All right, I think we're about ready. Go ahead. Thank you very much. Thank you, Your Honor, and may it please the Court. There's no question that the law is a noble profession, but it also comes with some harsh economic realities. Not every attorney is fortunate enough to work for the government or a white-shoe law firm, where access to capital is not a constraint on the ability of lawyers to invest in technology and support that drives costs and, therefore, fees down. Most are, in fact, forced to borrow money at usurious rates from the market, which not only drives up their costs and fees, but also puts extraordinary pressure on attorneys, exactly the kind of economic pressure that Rule 5.4 is intended to prevent. Now, there's an easy answer to this conundrum, one that is followed by the District of Columbia, Great Britain, from whom this country's legal tradition comes from, and Australia, and that has also been recommended by several ABA commissions, namely, to allow non-lawyer investments, investors in law firms. That's a policy argument that we ought to change these rules, and it would be good for the country, the clients, the legal profession, and everybody else. Well, Your Honor, I think it's an argument explaining why Jacobian Meyers' rights of association are infringed upon because— But what you're saying is there are various economic regulations of the legal profession as a business that you think are, as a policy matter, as a matter of your economic analysis, things that drive up costs, right? And then the extrapolation from that is this makes access to the courts harder, and therefore, these, essentially, economic regulations have to be subjected to strict scrutiny. That's the basis of the argument, right? That is correct, Your Honor. It's our position that the rules on non-lawyer investment are an impediment to Jacobian Meyers' ability to associate with its clients for the purposes— Well, but that would be true—the way you put that, that would be true if this were any other profession or any other kind of business, that there are lots of regulations that, you know, a whole political party bases its electoral campaign on the idea that there are too many such regulations and that they're bad for the customers, and you could say they, therefore, inhibit the ability of those businesses to associate with the customers that they would like to associate with because those customers can't afford it. There's got to be something special about this, and the something special is it's the First Amendment, it's access to the courts, it's that kind of association. That's exactly right, Your Honor. So why isn't every legal—or maybe your position is every regulation of the legal profession is subject to strict scrutiny and has to be approved—has to be struck down by a court unless it passes that compelling interest test? Well— Is that not the essence of your argument? Your Honor, I don't think our argument has to reach that far. Well, why not? What about the requirement that a client can only be represented by a licensed attorney? Doesn't that drive up the costs and make it harder for people who are not capable of effectively representing themselves to have access to the courts? It might, Your Honor, but— It surely does. It obviously does, doesn't it? It does, Your Honor, and I would submit that it would not be—one couldn't bring those specific types of claims in federal court under Rule 11 because you couldn't plausibly allege that such restrictions— It doesn't support a compelling state interest? There's no argument—there's no legitimate, straight-faced argument you can make that it's a debatable policy matter whether this is really good or not, whether we could have paraprofessionals who are educated in some way who might be able to do certain decent claims. Why wouldn't a court have to decide whether the basis of licensing or any particular licensing requirement—why a three-year law degree in states that require that, why this particular bar exam in states that require a particular bar exam—we could get along just as well with, for example, a multistate bar exam. Why would a state be entitled to require a particular bar exam unless they could show that there was a compelling interest that it would just be horrible for the world to not have this particular requirement? Well, Your Honor, I would suggest that given the fundamental First Amendment rights of association that are at issue in this case and potentially the hypotheticals Your Honor raised, that the government should indeed be required to demonstrate that those restrictions are narrowly tailored to the compelling state interest at question. Ultimately, it would be federal courts that would be setting the licensing requirements, for example, for each state for admission to the bar, because we'd have to decide whether each and every one of those regulations meets the compelling interest test. Well, Your Honor, that's the conclusion that's required by trainmen and United Mine Workers. Those are cases in which federal courts decided that state bar regulations were beyond the requirements for those particular compelling state interests. And I think it's important to remember that— The point of them was to limit the ability of certain people to choose certain lawyers or certain lawyers to engage in particular advertising practices and that sort of thing. Well, that may be true, Your Honor, but that doesn't change the fact that in this— But this is basically a commercial regulation, and you're saying that as a matter of economic theory, you think this is bad for the clients. Well, that's correct, Your Honor, but I don't think that—one can't square the notion that only lawyers who are engaged in political speech is protected and not commercial speech with trainmen and United Mine Workers. Those were personal injury cases. Wait, is there any commercial—there's no commercial speech involved in this case, is there? No, Your Honor. It's a question— It's the commerce itself that's being regulated. Well, I don't—Your Honor, it's not just a question of commerce. For example, Jacobian Myers represents plaintiffs who are in litigation against municipalities, including New York City, where the question is whether or not the state is following appropriate safety violations. And when they don't, Jacobian Myers clients are deprived of sometimes their life. They're injured. They have economic value. So in that sense, Jacobian Myers is literally engaged in the redress of grievances caused by the state, and they're seeking access to the courts to be able to do that. Are you doing that on a pro bono basis? No, Your Honor, but— You're a commercial enterprise, and that's really what's happening here. You're looking for investment, correct? Well, that's correct, Your Honor, and it's our— And I'd like to just follow up. In your opening, you referred to the District of Columbia as having adopted a rule more like the one you're proposing here. And when I looked at the District of Columbia rules, I saw that the District of Columbia now allows lawyers to practice in a partnership in which a financial interest is held by an individual who performs professional services that assist the organization, but the comments provides that it does not permit an individual to acquire part of the ownership of a firm for investment or other purposes. It seems to preclude exactly what you're proposing here. Have I misread the D.C. rule, or were you referring to something else? No, Your Honor, but I think the import of the D.C. rule is the notion that an outright ban on non-lawyers having an ownership in an interest in a law firm is not necessarily narrowly tailored to the compelling state interest of maintaining— It doesn't reflect any sense of obligation. D.C. adopted this as a practice, as a new policy matter, that it would allow an accountant, for example, or an economist to affiliate in a law firm. But there's no indication on the face of the rule that they felt compelled to do so by any constitutional interest, is there? No, of course, Your Honor, but the point is— And precisely the kind of investment that you're proposing here, they preclude. That is correct, Your Honor. I would point out the American Bar Association commissions have on several occasions espoused the value of having non-lawyer investments precisely for the point that it would allow increased access to the courts. As it stands now, a lack of non— Has the bar ever taken the position that it's constitutionally mandated? No, Your Honor, and we're not necessarily arguing that it's constitutionally mandated. Our point is only that the restriction on non-lawyer investment is an impediment on Jacoby and Meyer's ability to associate effectively with their clients to provide effective and affordable legal representation. And as a result, their ability to advocate for their clients in court, including with respect to grievances against municipalities and other government entities, is impaired. And so what you're—I'm just trying to follow up the logic. This is the lawyer's right to associate that you're relying on, at least for this aspect of your argument. You're not necessarily making the argument that the clients or potential clients or abstract clients everywhere are impeded because overall the market for legal services is put out of their reach? Your Honor, it's both.  Yes, Your Honor, and that's the point we made in, I believe, our reply brief. Under Kaplan and Drysdale and Triplett and Munson, lawyers can have third-party standing with respect to the rights of their clients. With respect to the rights of their clients, not necessarily with respect to the rights of people who might want to be clients of somebody. Well, Your Honor, I would suggest that Munson would answer that question, which is namely that, in fact, when First Amendment rights are at issue, the prudential standing requirements are relaxed. And it's certainly the case that Jacobi Myers has existing clients whose rights of association are negatively impacted by the law. I'm just saying I don't know why you need to go as far as a person in some state who might, for whatever reason, not be interested in your firm's services, but whose access to the market for legal services is economically affected by the rule. That seems a bridge pretty far, but you've got several simpler arguments for why you've got standing. I do, Your Honor, and that's not necessary. We have two. The first is under Trainman and Enri Primus. An attorney has a right, has essentially a cognate right with the clients. If a client's right- And when you say cognate, I wasn't quite sure what you meant. When I looked it up, it means born at the same time. It's usually used in linguistics, but more generally, it's just related to. But did you mean, like, coterminous with or identical with? Something different? I wasn't sure. Your Honor, the right of association involves two pieces. You have to have two people to associate. And if one of those members of the association has a First Amendment right and they associate for the purposes of advocating for that First Amendment right, then the lawyer portion of that association has the same constitutional protection of free association. And so that's what we mean by a cognate right. How would you define the state interest? What is the state interest in regulating the conduct of lawyers to maximize the effectiveness of lawyers' representation of clients? The interest that the state has identified is to maintain the independence and the professionalism of lawyers. Why is that not an important interest? Your Honor, I'm not contending that that's not a legitimate interest. Our contention is that non-lawyer- Does the state weigh the interest that you're advocating against the interest of having independence lawyers come out on the side of independence? Well, Your Honor, we have plausibly alleged that, in fact, the opposite is true, that the non-lawyer investment rules actually increase the economic pressure on lawyers. Matter of policy. That's your argument. The state objected to it. That's true, Your Honor. D.C. has a different interest. Much of what D.C. practices as law is really advocacy into the administration, requiring economists and sociologists and politicians and all other sorts of activities. But the New York bar is different. You can assume it's different. And is there a state interest involved? And how do you regulate that state interest? Why should the federal government be involved? Why should federal courts be involved? For the same reason that the Supreme Court found that it was appropriate for the federal government to get involved in trained men and United Workers. Those are places where there are other policies that were involved that were not being heeded by the states. Important federal policies of association and of representation of workers and the like. Does that mean that every time it is alleged that there is some kind of a trampling on a First Amendment right, the federal court has to become involved? If there are plausible allegations that an attorney can make consistent with Rule 11, then yes, Your Honor, they should. How do you make it plausible? You say that people are losing their right to effective representation. We don't know that to be so. We don't even think it's plausible. Your Honor, I think it's important to remember that we're here on a motion to dismiss. As a district judge, I see every time I have a conference all kinds of representations in FLSA cases, in 1983 cases, in discrimination cases. I don't see any way that people can't get a lawyer to come into court except the kinds of cases that deal with people who have eccentricity to them or plainly implausible claims. I don't know how you would say it's a plausible allegation to say that people have lost their ability to come into court. Your Honor, I think we have plausibly alleged both that the fact that attorney's fees and costs are higher than they would be, but for the lack of non-lawyer investment. Why isn't it as plausible, though, to conclude from your allegations that lawyers just could make more money if they had investors as opposed to that you would lower your fees? The law is a competitive environment, Your Honor. If attorneys are able to garner more clients and ultimately perhaps be more profitable, not because they charge more fees, but because they're able to expand their business, then they will— I could see aggregate torts, mass torts, where the capitalization of the law firm is crucial to being able to litigate the case that maybe there is an argument on your side on the theory that the ability to finance these kinds of cases is somehow lacking, which doesn't seem to be the case. But in the general area of representation, I don't see it. Your Honor, it's a simple matter of economics. We've certainly plausibly alleged that the cost of capital to law firms in the absence of non-lawyer investment— Say you plausibly, but it doesn't seem that way. Well, Your Honor, that was really the entire purpose of both the ABA commissions that recommended that non-lawyer investments be allowed. It's also the reason why Great Britain and Australia allow that. And frankly, one of the main reasons why Great Britain allows non-lawyer investment is for reasons of competitiveness, because law firms that can drive down their costs can more effectively compete on the international arena. Why? Because they can offer more effective services at a lower cost. I don't think we have to prove that there are a number of clients who can't access the courts because it's too expensive, although I do think we have plausibly alleged that. But we also allege that for existing clients, the costs are higher and that the representation can be more effective through the use of technology, more support. All of that would render the actual association more effective in vindicating the rights of the law. So the linchpin of the argument, really, and I think this is sort of where we started out, is that virtually any regulation of the legal profession automatically raises First Amendment issues that compel the invocation of the strict scrutiny standard, because in any such regulation, there is an increase in the costs of legal representation. And anything that drives up the cost of legal regulation in any way needs to be justified by a compelling state interest and be narrowly tailored to accomplish that interest. Without that, the rest of this becomes just an interesting policy argument about what are the best ways of assuring effective operation of a particular profession. That's true, Your Honor, but again, it's limited by the ability of a litigant to plausibly allege. No, but every regulation increases costs. The question then becomes, is it narrowly tailored to support a compelling government interest? And that is a very hard test to meet, right? Didn't the Supreme Court in the equal protection context once refer to it as strict in theory, fatal in fact? Or is that maybe just some academics' statement? But that's often the case, right? You don't see many cases – You probably lynch on constitutional law. Yeah, you probably don't see many cases where the compelling interest test is satisfied. That may be true, Your Honor. We're talking about fundamental first-amendment rights here and the ability of clients to associate with lawyers for the ability to effectively associate for the redress of their grievances. We've kept you way over your time, and you can use your three minutes of rebuttal now, but I assume you want to save it. If Your Honors have more to discuss, I'd be happy to. Otherwise, we can save the three minutes. All right, good. Thank you, Your Honor. Mr. Rees-Davies. Good morning. May it please the Court, Andrew Rees-Davies representing the presiding justices, the Attorney General, and the heads of the grievance committees. The Court's being asked to rule that lawyers have a constitutional right to use the one specific form of funding that every state prohibits. And the states prohibit that form of funding for client protection purposes to stop attorneys taking on obligations to external investors that could compromise the fiduciary obligations they owe to their clients. The claim fails for two main legal reasons, both of which really come down to the same core problem, which is that this prohibition on non-lawyer equity is so very far removed from the rights guaranteed by the Petition Clause. First of all, this prohibition doesn't touch on Petition Clause rights. The fact that some clients represent clients who are petitioning the government doesn't mean that law firms as businesses are effectively exempt from regulation. And second, even if we were to assume that regulations that impose a cost on lawyering could raise Petition Clause concerns, there's no allegation that this particular restriction interferes with the exercise of Petition Clause rights in any cognizable way. And perhaps to take those points in reverse order, we presume it's true that Jacobian Myers could make investments that would make it more efficient and lower its costs, and that it's not prepared to make them using all the sources of funding that are available, but it would make them if only it could have access to outside equity investors. So you say could make investments? Yes, Your Honor. We presume it's true. They allege in the complaint that they could make these investments and they would be able to reduce their costs. But when they receive, they were going to be invested in by outside entities. I'm sorry. What I meant, Your Honor, was that they could receive equity from outside investors and then use it to improve their own infrastructure. That's essentially what they say, and thereby reduce their costs. But this is an indirect, attenuated theory, and it just doesn't rise to the level of a direct and substantial interference in anyone's right to petition. And it's not just a question of degree that requires fact-finding. It's just that, as alleged, it doesn't rise to the level of being cognizable. It's just like this court's decision in Fighting Finest where the court affirmed the dismissal at the motion-to-dismiss stage of associational claims. In that case, because there was no allegation that any person had actually suspended or curtailed the associational activities. And we have that in this case. There is no allegation that any person, any litigant, has actually foregone litigation because of this rule. There's no allegation that it does anything else that could even arguably qualify as a direct substantial infringement. Rule 12 motions. We don't really get into that. How do we measure plausibility? Well, we need an allegation that creates a reasonable inference of liability. And we just don't have that because all we have is this fairly anemic allegation that if we had non-lawyer equity, we could amplify our capacity or fortify our capacity to associate with clients. And I think it's telling. We had a concession this morning from my adversary. I think the argument is that if only we could get outside financing, we could lower our rates as attorneys. And because we'd have lower rates, people who couldn't afford a lawyer would be able to afford Jacoby and Mars. And therefore, they would have representation where they don't have representation now. Your Honor, that would apply. It's a rather far-fetched argument, but I think that's the syllogism that Mr. Replacenship is advocating. Well, I think that's right, Your Honor. That is what he's advocating. But that would mean that every regulation would have to effectively satisfy First Amendment requirements. And I think it was admission this morning that that's true. What you're saying to us is that the historic interest of the states in regulating the conduct of lawyers so that there is proper representation of clients does not have to meet a strict scrutiny argument, but it's a legitimate police interest of the state. Absolutely, Your Honor. And it's telling that much more substantial and much more direct interferences in actual attorney-client relationships have been held. In what cases would there be strict scrutiny? There are a few Supreme Court cases. How would you rationalize that? Well, Your Honor, let me turn to those cases. They're relying on the button line of cases, effectively. But what those cases say is that injured people have an associational right to take group legal action to seek redress, whether they're members of a union or an advocacy group like the NAACP or the ACLU. And when that type of group legal plan— There's a much more direct infringement on the right of individuals to gather together to sue. That's the right that these cases discuss, Your Honor. It's when there is a group legal plan that an integral part of that is connecting litigants with lawyers. The government can't frustrate the group's associational rights by stopping the group referring people to lawyers, and it can't indirectly infringe the group's associational rights by stopping the lawyer from taking on the representation. And we see that in reprimis. Here the alleged infringement is attenuated and speculative. Absolutely, Your Honor. Therefore, not plausible. That's exactly right, Your Honor. Therefore, you should win your motion to dismiss. That's exactly right, Your Honor. Anything more to say? Just to conclude, the only association that's really being impeded by this rule is the association between Jacoby and Myers and its potential outside investors. And there's no colorable claim that that's a relationship that's protected by the First Amendment. Unless the court has further questions, I'll ask that the district court's judgment of dismissal be affirmed. All right. Thank you very much. Mr. Blankenship on rebuttal, and I think this time I'm going to hold you to it. We have had a pretty full airing of the issues here, so I'll hold you to the time. Your Honor, I would just like to make a couple of quick points. The first is that the Attorney General concedes that we plausibly allege that the non-lawyer investment rules result in a less effective representation and increased costs. It is hard to square that concession with the notion that Jacoby and Myers and its client's right of association aren't impeded. I'm sorry. You say they concede that the non-investment rule results in less effective representation? Where is that? I believe that was what my adversary stated. He conceded that it leads to increased costs for lawyers. Certainly, which translates to higher fees, of course. And if it stands to reason that higher fees have an effect on representation, and that's the Supreme Court decision in the United Transportation Union. There, the court held that the cost in simply transporting clients to their lawyers and to the court was protected by the First Amendment. If a cab fare is protected First Amendment, then the ability of a law firm to reduce its costs, and therefore its fees, should certainly be protected. The other point I would make is that the state seems to contend that the right of association somehow has to involve a trade group or some other existing organization that those people are associated with the lawyers. But there's no basis in the law to presume that. The question is simply whether or not clients association with lawyers is impeded or their ability to associate with lawyers is impeded by the non-lawyer investment rules. And if the result is increased costs and increased fees and thus less access, I think the answer has to be yes. Unless the court has other questions, I would respectfully suggest that the district court's judgment be vacated. Thank you both very much for a very interesting argument, and we will reserve the decision. You might want to stay around. There's going to be another case later about whether clients and lawyers have a right to go to court in these associational ways with respect to labor unions and such in particular. But that might just be – you've probably got other things to do.